U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
MAR 2 8 2013
CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HOMERO HERRERA, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-881-BJ |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER | § | |
| OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Homero Herrera ("Herrera") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"). For the reasons stated herein, the decision of the Commissioner is **AFFIRMED**.

### I. STATEMENT OF THE CASE

Herrera applied for DIB and SSI on April 14, 2009, alleging that his disability began on March 13, 2009. (Tr. 17, 197, 205.) After his applications for benefits were denied initially and on reconsideration, Herrera requested a hearing before an administrative law judge. (Tr. 53–56, 73.) The ALJ held a hearing on April 5, 2011, and issued an unfavorable decision on April 26, 2011. (Tr. 11–52.) On October 28, 2011, the Appeals Council denied Herrera's request for review, leaving the ALJ's decision as the final decision of the Commissioner in his case. (Tr. 1–8.) Herrera subsequently filed this civil action seeking review of the ALJ's decision.

### II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory

provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (2012) (disability); 20 C.F.R. Pt. 416 (2012) (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and the SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity." 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the claimant must not be presently working at any substantial gainful activity. *Id.* §§ 404.1520(b), 416.920(b). "Substantial gainful activity" is defined as work activity "that involves doing significant physical or mental activities . . . for pay or profit." *Id.* §§ 404.1572, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. *Id.* §§ 404.1520(c), 461.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(f), 416.920(f). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(g), 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding his physical and mental limitations. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* §§ 404.1520(a)(4), 416.920(a)(4). At step four, the claimant's RFC is used to determine if the claimant can still do his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* §§ 404.1520(e), 416.920(e). At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III. ISSUE

In this action, Herrera presents a single issue to the Court: Whether the ALJ's RFC finding is supported by substantial evidence. (Pl.'s Br. 2.)

## IV. ALJ DECISION

In his April 26, 2011 decision, the ALJ concluded that Herrera was not disabled within the meaning of the SSA. (Tr. 17.) In making his determination, the ALJ followed the five-step sequential evaluation process. At the first step, the ALJ found that Herrera had not engaged in any substantial gainful activity since March 13, 2009—the alleged disability onset date. (Tr. 19.) At the second step, the ALJ found that Herrera had the following severe impairments: (1) loss of vision in the right eye, (2) status post retinal detachment, (3) hypertension, and (4) mild degenerative changes of the right hip. (Tr. 19.) At the third step, the ALJ found that none of Herrera's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 20).

The ALJ then found that Herrera had the RFC to perform light work, with the following restrictions:

> [Herrera] can lift and carry 20 pounds occasionally and 10 pounds frequently. He can stand and walk about 6 hours in an 8-hour workday. He can sit about 6 hours in an 8-hour workday. He cannot climb ropes or scaffolds. He can occasionally climb ladders and frequently climb ramps and stairs. He can frequently balance, kneel, crouch, crawl, and stoop. He has no manipulative or communicative limitations. He has no visual limitations except for some loss of depth perception because of loss of vision in the right eye. He cannot work around hazardous moving machinery or at unprotected heights.

(Tr. 20.) Based on this RFC assessment, the ALJ found at step four that Herrera was able to perform his past relevant work as an assembler and molding machine operator and, thus, he was not disabled. (Tr. 24.)

## V. DISCUSSION

In a single issue, Herrera argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to include limitations relating to Herrera's left-eye impairments and his urinary incontinence, as well as his cervical spine, back, hip, and knee impairments. (Pl.'s Br. 4.) Subsumed within this issue is Herrera's argument that the ALJ erred by failing to find these impairments to be severe. (Pl.'s Br. 4–5.)

RFC is what an individual can still do despite his limitations. SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.*; *see also Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SSR 96-8p, 61 Fed. Reg. at 34475; *see also Myers*, 238 F.3d at 620. RFC is not the least an individual can do, but the most. SSR 96-8p, 61 Fed. Reg. at 34475. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered, and is based upon all of the relevant evidence in the case record. *Id.* at 34476–78. The ALJ should discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and resolve any inconsistencies in the evidence. *Id.* at 34478.

In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-8p, 61 Fed. Reg. at 34478; SSR 96-7p, 61 Fed. Reg. 34483, 34484 (July 2, 1996). The ALJ must also consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. SSR 96-8p, 61 Fed. Reg. at 34477. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but presumptions,

speculation, and supposition do not constitute evidence. *See* SSR 86-8, 1986 WL 68636, at *8 (1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (Aug. 1, 1991) (only to the extent that the SSR discusses the former procedures used to determine disability in children). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

A. **Vision Impairments**

There is no dispute that Herrera suffers from a loss of vision in his right eye. The ALJ identified this loss of vision as a severe impairment and included a visual limitation in the RFC assessment of "some loss of depth perception because of loss of vision in the right eye." (Tr. 20.) Herrera argues that because he also suffers from a cataract in his left eye, his vision is more limited than the RFC finding reflects. (Pl.'s Br. 6.)

In support, Herrera relies upon the June 9, 2009 report of consultative ophthalmological examiner James H. Gray, M.D. ("Dr. Gray"). The ALJ's decision discusses this report, noting that Dr. Gray diagnosed Herrera with an early cataract in the left eye but also that Herrera had best-corrected distance visual acuity of 20/30 in the left eye.[1] (Tr. 22.) This report also includes a diagnosis of left-eye astigmatism and contains Herrera's Jaeger test results, which show that the acuity of Herrera's near vision in his left eye, with correction, was measured at J4.[2] (Tr. 325–26.) Herrera also points to records from John Peter Smith Ophthalmological Clinic ("JPS"), which include diagnoses relating to his left eye of pterygium[3] and "incipient cataract – may be visually sig." (Tr. 428, 436, 440.) The ALJ's decision notes that these records show that, on

---

[1] Dr. Gray's report contains two separate measures of visual acuity: (1) the Snellen test, for distant vision, and (2) the Jaeger test, for near vision. (Tr. 325.) *See Test Types, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 403800 (Westlaw).

[2] Plaintiff explains that "J4" is 20/43 vision. *See* Jaeger Test Types, TheFreeDictionary, http://medical-dictionary.thefreedictionary.com/Jaeger+test+types (last visited March 14, 2013).

[3] Pterygium is a "triangular patch of hypertrophied bulbar subconjunctival tissue." *Pterygium, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 341240 (Westlaw).

6

September 29, 2009, Herrera was assessed with visual acuity of 20/25 in the left eye. (Tr. 22, 434.)

Herrera asserts that the ALJ failed to address Dr. Gray's exam findings, as reflected in the Jaeger test results, that Herrera's near-vision acuity in his left eye was limited. (Pl.'s Br. 6.) The medical records show diagnoses of left-eye impairments (astigmatism, pterygium, and an incipient cataract), but the mere diagnosis of an impairment does not establish a disabling impairment or even a significant impact on a claimant's RFC. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). While medical exams showed that Herrera's distance vision could be corrected to at least 20/30 in the left eye, Dr. Gray's report appears to be the only record specifically addressing Herrera's near vision, which was tested and assessed at 20/43. While this testing objectively shows some limitation in Herrera's near-vision acuity, there is no objective evidence regarding the extent of the limitation or its impact, if any, on Herrera's ability to work. Herrera does not point to any medical records showing that doctors observed functional limitations related to Herrera's near vision or imposed any restrictions due to his left-eye impairments.

Herrera testified that he had "blurriness" in his left eye, but he did not explain how this blurriness affected him beyond the effect already imposed on his eyesight by the loss of vision in his right eye. For example, Herrera testified at the hearing that he was unable to watch television for more than five to ten minutes and that he was unable to drive, and he stated in his disability report that he had trouble reading and that he had had several car accidents because he could not see well. (Tr. 39–41, 227.) However, there is no evidence that Herrera's left-eye impairments, as opposed to his right-eye vision loss, caused or exacerbated any of these vision limitations that Herrera claimed. Furthermore, Herrera testified that he was able to read the Bible, albeit for only three to five minutes at a time. (Tr. 22, 40.)

Ultimately, Herrera bore the burden of proving that his left-eye impairments affected his ability to do work-related activities. *See Crowley*, 197 F.3d at 198. While there is evidence that Herrera's near vision was not perfect, the record does not contain evidence of any actual effects or restrictions on his ability to work relating to his near vision. The ALJ recognized Herrera's visual limitations by including Herrera's "loss of depth perception because of loss of vision in the right eye" in the RFC assessment. (Tr. 20.) The Court recognizes that Herrera was diagnosed with left-eye impairments, but Herrera has not provided the Court with evidence of any further functional limitations attributable to these impairments. Accordingly, the Court cannot conclude that the ALJ's decision that these impairments were not severe, as well as his decision that these impairments did not require any additional restrictions in the RFC assessment, were unsupported by substantial evidence. *See Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382.

### B. Cervical Spine, Back, Hip, and Knee Impairments

Herrera next argues that the ALJ erred by failing to find his cervical spine, back, hip, and knee problems to be severe impairments and that the ALJ's RFC finding does not accurately reflect Herrera's standing and walking limitations. (Pl.'s Br. 4, 6.) The ALJ included "mild degenerative changes of the right hip" in his list of Herrera's severe impairments at step two, but he did not list Herrera's alleged cervical spine, back, and knee impairments. (Tr. 19.) Further, in the RFC assessment, the ALJ found that Herrera could stand and walk about six hours in an eight-hour workday and that he could sit about six hours in an eight-hour workday.

In the RFC assessment, the ALJ reviewed Herrera's testimony as well as the medical evidence relating to Herrera's complaints of cervical spine, back, hip, and knee pain and concluded that Herrera's subjective complaints of pain were "out of proportion to the objective medical evidence." (Tr. 23.) The ALJ reviewed a June 3, 2009 CT scan of the thoracic spine and noted that it was "negative." (Tr. 23.) More specifically, this CT scan showed mild

hypertrophy degenerative changes but no convincing evidence of acute thoracic vertebral fracture, dislocation, or destructive osseous lesion and no significant soft tissue swelling. (Tr. 378.) Also on June 3, 2009, a CT scan of the cervical spine showed degenerative disc changes and posterior disc bulging as well as an osseous fragment along the left anterolateral aspect of the C6-C7 interspace, which "probably represents chronic dystrophic calcification or similar pre-existing lesion rather than an acute fracture." (Tr. 377.) This CT scan showed no significant acute traumatic osseous lesion of the cervical spine. (Tr. 377.)

The ALJ next noted in his discussion that January 20, 2010 medical records contain a report of an x-ray of the right hip, which showed minimal dengerative changes. (Tr. 23, 390.) An x-ray of the lumbar spine showed increased sclerosis with some irregularity along the sacroiliac joints that appeared compatible with, but not diagnostic of, rheumatoid spondylitis. (Tr. 23, 391.) These medical records contain a nurse's observation that Herrera was using a cane to walk. (Tr. 388.) However, Herrera does not point to any evidence in the medical records that the use of a cane was prescribed or recommended by any medical source.

A February 15, 2010 exam revealed tenderness over the upper thoracic vertebrae and right hip with decreased range of motion, but x-rays of the right hip and thoracic spine were negative. (Tr. 23, 396, 408.) On March 11, 2010, Herrera reported that his back pain was improving. (Tr. 23, 410.) However, he subsequently continued to experience back pain and was assessed with back pain in April, May, July, and August 2010. (Tr. 412, 414–15, 425.)

The ALJ found that there was no medical evidence to support Herrera's complaints of knee pain. (Tr. 23.) A June 9, 2009 consultative internal medicine exam by Adebola Olatunji, M.D. showed normal range of movement in both knee joints, and there was no diagnosis of any knee-related impairment or pain. (Tr. 321–22.) Herrera points to a March 11, 2011 report interpreting an x-ray of his right knee, performed in Mexico, which shows injuries of the internal

9

menisci. (Tr. 459.) Herrera also points to a February 21, 2011 medical record containing a diagnosis by Dr. Emilio Duant Izaguirre ("Dr. Izaguirre"), also from Mexico, of right gonarthrosis due to varus. (Tr. 466.) Dr. Izaguirre opined that surgery was required to correct the varus deviation of the right knee.[4] (Tr. 466.)

After reviewing the evidence, the ALJ noted in his decision that, although Herrera had complained of upper and lower back pain, x-rays of the lumbar and thoracic spinal regions had been "essentially normal." (Tr. 23.) The ALJ stated that the medical records showed no surgical lesion, nerve root compression, or objective signs of an incapacitating impairment, such as muscle atrophy or grossly abnormal neurological deficits. (Tr. 23.) Further, x-rays of Herrera's right hip showed "only minimal degenerative changes." (Tr. 23.) The ALJ also stated that Herrera's complaints of pain were inconsistent with his reported activity level, specifically noting Herrera's testimony that he had traveled via bus or car to Mexico ten to twelve times in the year preceding the hearing. (Tr. 23.) Still, the ALJ stated that he had considered all the credible evidence and had given Herrera every benefit of the doubt as to his subjective complaints in finding that Herrera was limited to a restricted range of light work, including postural limitations applicable to his complaints of back pain. (Tr. 23.) In so doing, the ALJ rejected the opinion of the state agency medical consultant, who had found that Herrera was less restricted and was able to perform a medium range of work. (Tr. 23–24.)

Herrera argues that he is more limited than the ALJ's RFC finding establishes, but he points only to diagnoses of cervical spine, back, hip, and knee impairments to support his contention. While these records may constitute objective evidence of some impairment or pain, Herrera does not explain how they necessarily compel the conclusion that he cannot stand and

---

[4] The Court notes that the medical records upon which Herrera relies are written in Spanish, and the English translation in the record was not submitted to the Commissioner until after the date of the ALJ's decision. (Tr. 4.)

walk for six hours a day or sit for six hours a day. Neither does Herrera explain how these diagnoses necessarily require a finding of a more extreme degree of functional limitations than those found by the ALJ. *See Morris v. Astrue*, No. 4:11-CV-631-Y, 2012 WL 4468185, at *8 (N.D. Tex. Sept. 4, 2012) (explaining that a mere diagnosis of an impairment is not sufficient to establish its severity), *adopted in* 2012 WL 4466144 (N.D. Tex. Sept. 27, 2012). Accordingly, the Court concludes that the ALJ thoroughly reviewed the evidence relating to Herrera's physical impairments and resulting limitations. While Herrera may disagree with the ALJ's RFC finding, the record contains substantial evidence to support the ALJ's conclusion, and the Court cannot reweigh the evidence and substitute its own judgment for the ALJ's opinion. *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1383.

### C. **Urinary Incontinence**

Herrera additionally argues that the ALJ's decision is flawed because the ALJ did not find his urinary incontinence to be a severe impairment or accommodate Herrera's urinary incontinence in the RFC finding. (Pl.'s Br. 9.) The ALJ noted that a February 14, 2010 medical record contains a diagnosis of urinary incontinence. (Tr. 23, 402.) Herrera was prescribed medications to treat incontinence. (Tr. 402.) Herrera points to his own testimony that he is not able to control his urination "practically daily" and that such incidents "may occur various times within a day" (Tr. 44), but he identifies no other evidence in the record showing that he pursued or received any further medical treatment for this condition. Herrera points to no medical records that either show the efficacy of the drugs prescribed or corroborate Herrera's contention that he continued to experience incontinence beyond this single doctor's visit in 2010.

Herrera claims that his urinary incontinence would cause him to have to work close to a restroom and have frequent restroom breaks. (Pl.'s Br. 9.) However, the medical record relating to this impairment is sparse and simply does not contain any objective evidence of any such

limitation. Herrera's subjective complaints must be corroborated at least in part by objective medical evidence. *See Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). In addition, subjective complaints must be reasonably consistent with the objective evidence provided in the record. *See Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987). With the paucity of evidence relating to Herrera's incontinence and its alleged limitations, the Court concludes that the ALJ's decision is supported by substantial evidence and, thus, that the ALJ did not err by omitting Herrera's urinary incontinence from his list of severe impairments and by deciding not to include a limitation in the RFC assessment to accommodate Herrera's urinary incontinence. *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1383.

### D. Vocational Expert Testimony

Finally, Herrera contends that the ALJ's finding at step four that Herrera is capable of performing his past relevant work as an assembler and molding machine operator is erroneous because "most" of these jobs, as described by the Dictionary of Occupational Titles ("DOT"), require frequent use of depth perception.[5] (Pl.'s Br. 10.) *See* Employment and Training Administration, U.S. Dep't of Labor, 1 Dictionary of Occupational Titles (4th ed., rev. 1991). At the hearing, the vocational expert ("VE") testified that Herrera's past relevant work included "work as an assembler," which "is described in the DOT as sedentary, unskilled, SVP: 2 to semiskilled SVP: 3." (Tr. 49.) Next, the VE testified that Herrera's past relevant work also included work as a "molding machine operator," which is "light in exertion, semiskilled at an SVP: 3." (Tr. 49.)

The ALJ then asked the VE whether a hypothetical person with Herrera's RFC could perform any of Herrera's past relevant work. The VE responded, "Yes. The assembly job would

---

[5] Herrera also contends that most of these jobs are incompatible with restrictions relating to near vision, frequent restroom breaks, and his alleged more extreme difficulties in standing and/or walking. (Pl's Br. 10.) Because the Court has found that the ALJ's decision not to include these additional limitations in the RFC was supported by substantial evidence, the Court need not address this argument.

fit that hypothetical as would the molding machine operator as [Herrera] described it[,] . . . [and] those jobs also exist at the light level." (Tr. 50.) The ALJ also asked, "Does your testimony conform to the DOT?" The VE replied, "Yes, it does." (Tr. 51.)

The VE did not identify, and neither the ALJ nor Herrera asked her to identify, the specific DOT codes for the assembler and molding machine operator jobs that the VE said Herrera could perform. The Court observes that the DOT has many job titles that contain the words "assembler" or "molding machine operator," with each such job title having varying levels of usage of depth perception. However, the VE is not, *per se*, required to identify the specific DOT codes to alleviate any potential inconsistencies. *Jackson v. Astrue*, No. 4:11-CV-028-Y, 2011 WL 4943547, at *11 (N.D. Tex. Aug. 23, 2011), *adopted in* 2011 WL 4940998 (N.D. Tex. Oct. 17, 2011). Remand is required only when it is impossible for a court to determine whether a conflict exists between the DOT and the VE's testimony. *See id.*

Here, however, the Court need not speculate whether the jobs identified by the VE require usage of depth perception that is incompatible with Herrera's RFC because the ALJ expressly asked the VE whether her testimony regarding Herrera's ability to return to his past relevant work as an "assembler" and "molding machine operator" conformed to the DOT, and the VE expressly stated that it did. Therefore, because the evidence in the record shows that Herrera retains the functional capacity to perform his past relevant work, remand on this ground is not required. *See id.* at *12 (explaining that if the VE states that no conflict exists between her testimony and the DOT's job descriptions, reversal of the ALJ's decision is not required).

## VI. CONCLUSION

The ALJ's decision is **AFFIRMED** in all respects.

SIGNED March 28th, 2013.

                                    _____
                                    JEFFREY L. CURETON
                                    UNITED STATES MAGISTRATE JUDGE